Defendant contracted with plaintiff to drill for him a water well on his premises in the Village of Kingsville, in Rapides Parish. The contract was oral and, as so often happens, there is material difference between the parties as regards the exact obligations defendant assumed thereunder. Plaintiff contends that defendant guaranteed to bring in a well of good water, sufficient in volume to meet his needs and purposes, which were well known to defendant, even though he had to drill to a depth of 65 feet to do so. Defendant denies that *Page 480 
he made such a guarantee and asserts that he agreed only to set casing with strainer in the first sand below a strata of quicksand known by both parties to be below the surface of the ground in and about Kingsville. Defendant agreed to furnish the casing and a 10-foot copper strainer.
Defendant drilled the well in plaintiff's yard to a depth of 58 feet, struck sand and then set 4-inch casing with 10-foot second-hand strainer. This was below the quicksand strata above mentioned. Water soon rose in the well to about 20 feet of the surface. Defendant remarked to plaintiff at that time that the well was a good one and would supply ample water for all his needs. Relying upon this statement and the quantity of water then in the well, plaintiff at that time paid to defendant $300, the price agreed upon for drilling the well. Defendant then removed the drilling equipment and has not since then done anything to correct the unsatisfactory condition that immediately thereafter developed in the well, about which plaintiff complains.
The method employed to produce clear water in a well of this character is to pump the muddy water therefrom continuously until all of it has been withdrawn. To accomplish this result a pipe is dropped to near the bottom of the well to the top end of which is affixed a motor pump. Plaintiff had a pump of small power that he immediately employed to pump the water from the well, but it was heavily charged with sand. This was made known to defendant, who came to the well and advised plaintiff to continue pumping, assuring him that the water would soon clear up. This advice was followed but the water did not become clear; in fact, it ceased to rise in the well. In other words, the inflow was not as great as the volume pumped out, even with the small pump. When informed of this condition, defendant advised plaintiff to use a larger pump and remove all the water from the well and thereafter the inflow would be clear. Plaintiff bought a larger pump at an expense of $158. This pump, regulated to a capacity of 280 gallons per hour, pumped the well dry in ten minutes. At time of trial of this suit, this same pump would remove from the well all the water therein in four or five minutes, through one three-fourths inch faucet. The depth of the well was measured and it was found to be only 42 feet. This proves that sand to a depth of about 16 feet had accumulated in the bottom of the well, which sand extended several feet above the top of the strainer.
Plaintiff, alleging breach of contract by defendant, sues to recover damages allegedly sustained by him as a result of the breach, to-wit:
Amount paid to defendant to drill the well ....................... $300.00 Cost of deep water pump .......... 158.00 Material and labor ............... 42.00 Damages arising from inconven- ience on account of lack of wa- ter ............................ 250.00 -------- Total ..................... $750.00
The case was dismissed as of nonsuit, each side being cast for one-half of the costs. Plaintiff appealed. The appeal has not been answered.
The lower court gave written reasons for judgment. Plaintiff's version of the terms of the contract was upheld. The court also held that defendant had breached the contract in the particulars contended by plaintiff, but that the amount of damages sustained as a result of the breach had not been satisfactorily proven.
Defendant is experienced in the drilling of water wells. He has pursued that business for many years. Prior to drilling the well for plaintiff he drilled several wells in the village of Kingsville wherein satisfactory water in abundant quantity at a depth of not more than 65 feet was obtained. Plaintiff lives in Kingsville and was well acquainted with these wells and knew their production; in fact, one of them belongs to his father-in-law. He also knew that defendant was experienced in water well drilling. It was due to this knowledge that he engaged defendant to drill his well. Each believed that water in adequate quantity and of satisfactory quality could be gotten on plaintiff's premises at a depth of not more than 65 feet, as was done in the other wells drilled by defendant in Kingsville.
As to the terms of the contract, we are convinced, as was the trial judge, that the testimony and surrounding facts and circumstances clearly sustained plaintiff's position. It would have been unthinkable and obviously unbusinesslike for plaintiff to be willing to pay $300 for a hole in the ground without a guarantee of adequate water supply. *Page 481 
Subject to exception noted below, we quote with approval from the lower court's reasons for judgment, to-wit:
"The evidence shows that the well immediately filled with sand because the holes in the strainer were too large for the sand in which it was set. The defendant is an experienced man in the drilling of water wells and it would seem that he should have been able to have determined that the strainer would not keep the sand out. Certainly the plaintiff had no such knowledge as he knew nothing about water wells.
"The evidence shows that a well drilled in the immediate vicinity by this defendant sanded up immediately just as this well did and that he went back into the well, made it larger and placed pea gravel in sufficient quantity around the strainer which kept the sand back and developed a good well.
"It is my understanding that in most wells it is necessary to place gravel around the strainer to prevent the sand from entering therein. How much was placed about the strainer in this well was not disclosed but whatever was done, it is my opinion that a good water well could have been produced if the strainer had been properly set with sufficient gravel placed therein to keep the sand back or if the sand was too fine even for the gravel to prevent it from flowing therein, then it was a duty of the defendant to have set the strainer in such a sand, if it could have been found within the depth of one hundred feet, as the defendant had agreed to put the well down to that depth if necessary. The purpose of the contract was to put down a water well and that undoubtedly was understood by the defendant and that was his undertaking. He was experienced and the failure of the well to produce an adequate water supply was due to the fault, in my opinion, of the defendant. Both parties knew that the water bearing sand should have been found around sixty or sixty-five feet deep and presumably that is the sand in which the strainer was set."
[1] We think the court in error in its finding that defendant agreed to bring in a satisfactory well for the price named, even though a depth of 100 feet had to be drilled. Plaintiff testified that defendant agreed to drill to a depth of 65 feet if necessary, to reach proper sand.
We are in accord with the lower court's belief that the sand into which the strainer was set will afford the quality and quantity of water contemplated by the parties when the contract was entered into. Since it is certain about 16 feet of sand are now in the well and have been in it since soon after the strainer was set, the conclusion is inescapable that this sand entered through the strainer. The openings in the strainer are too large. This may be corrected by employing a strainer of smaller perforations or by doing this and also depositing some quantity of pea gravel about the strainer. This gravel, while blocking off the sand, will admit the water. This process worked successfully in other wells at Kingsville. As an experienced well driller, defendant is not without full knowledge concerning such matters.
[2] If this well is properly reworked and an appropriate strainer affixed, we have little or no doubt that satisfactory results will be obtained. What this will cost the record does not disclose. The expense of going back into the well and performing the needed acts to attain adequate water production will fall upon defendant. This expense should not amount to as much as drilling a new well.
If defendant is unwilling to proceed further under the contract, plaintiff will have the unquestioned right to take such steps and incur such expenses as are necessary to convert the well into a producer of the character contemplated originally, or which will prove that production contemplated by the parties is not possible. Should satisfactory production not be obtained after such effort, plaintiff will then have a right of action again defendant to recover the $300 paid him, plus the added expenses of reworking the well. If satisfactory production is obtained, defendant will be liable to plaintiff for the cost incurred in doing so.
[3] The pump which plaintiff purchased will be needed to lift water from the well when completed or from any other well plaintiff may have drilled. The cost of the pump is in no sense of the word a total loss to him. It is practically new and could be sold, perhaps, for as much or more than it cost.
[4] The charge of $42 represents price of labor and materials for erection of a pump house. The house is on plaintiff's premises and will serve the purposes for which erected when the well is completed. *Page 482 
This outlay does not represent a loss to plaintiff.
Plaintiff and family suffered some inconvenience because of the well's inadequate supply of water. Plaintiff was able to procure needed supply of water from a neighbor hard by. The claim on this account is not seriously urged. Damages arising from inconvenience that has been or may be suffered by plaintiff on account of the contract's breach should be asserted in a second suit if one is filed.
Neither side complains of the manner in which the costs of suit were taxed by the lower court.
For the reasons herein assigned, the judgment of the lower court is affirmed. Costs of appeal are assessed against plaintiff, the appellant.